**FRED LAVERY CO., d/b/a Fred Lavery Infiniti, Greentree Investment Co. and Frederick A. Lavery, Jr., Plaintiffs–Appellants,**

v.

**NISSAN NORTH AMERICA, INC. and Nissan Motor Acceptance Corp. Defendants–Appellees.**

No. 03–1005.

United States Court of Appeals, Sixth Circuit.

May 4, 2004.

586

Eric L. Chase, Bressler, Amery & Ross, Florham Park, NJ, Jeffrey J. Fleury, Stark, Reagan & Finnerty, Gary W. Faria, Ufer & Spaniola, Troy, MI, for Plaintiffs–Appellants.

Kevin A. Russell, Kenneth G. Schuler, Amy J. Kappeler, Latham & Watkins, Chicago, IL, Edward C. Cutlip, Jr., Kerr, Russell & Weber, Detroit, MI, for Defendants–Appellees.

Before SILER, MOORE and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.

Plaintiffs own an automobile dealership, which they claim was terminated in violation of federal and state law by Nissan North America, Inc. Nissan defeated some of these claims when the district court granted partial summary judgment in its favor, and it defeated the remaining claims when the district court ruled in its favor after a six-day bench trial. As none of plaintiffs' challenges to the judgment rises to the level of reversible error, we affirm.

## I.

In 1991, Fred Lavery Co. (Lavery) opened the first Detroit-area dealership devoted to selling Infiniti automobiles, a luxury brand manufactured by Nissan Motor Manufacturing Corporation U.S.A. Fred Lavery Co. is owned by Frederick Lavery, and Greentree Investment Co. owns the dealership's property. In opening this dealership. Lavery signed an agreement with Nissan North America, Inc. (Nissan), requiring Lavery "actively and effectively [to] promote . . . the sale at retail" of Infiniti cars. JA 302. Under the agreement, Nissan retained the right to evaluate Lavery's performance "on the basis of such reasonable criteria as [Nissan] may develop from time to time." JA 303. These criteria included "achievement of reasonable sales objectives" and "[a] comparison of [Lavery's] sales and/or registrations to sales and/or registrations of all other Authorized Infiniti Dealers" in the region. *Id.*

The dealership agreement allowed Nissan to evaluate Lavery's performance by using the percentage of luxury cars it sold in its Primary Market Area, which "is a geographic area . . . [used] as a tool to evaluate [Lavery's] performance of its sales obligations." *Id.* Nissan also retained the right to evaluate Lavery based on "performance in building and maintaining consumer confidence . . . as measured by surveys or indices of consumer satisfaction." *Id.*

While Lavery operated its franchise successfully for a few years, its sales figures soon began to drop. By 1995, Lavery had the lowest sales penetration of any Infiniti dealer in Nissan's Central Region, which covers portions of 21 midwestern States, and ranked in the Central Region's "Bottom Ten" under Nissan's Consumer Satisfaction Index. D. Ct. Op. at 7 (Finding of Fact 28).

In December 1996, Nissan placed Lavery in its Dealer Improvement Program. *Id.* (Finding of Fact 32). In connection with this program. Nissan conducted a comprehensive review of Lavery's operation and offered 30 suggested changes to the dealership. *Id.* (Findings of Fact 36–37). Nissan also assisted Lavery by providing funds for advertisement and accepting special requests for vehicle options, models and colors. *Id.* at 7 (Findings of Fact 33–34).

As an additional measure of support. Nissan altered the way it calculated Lavery's sales penetration statistics. After Lavery complained that Detroit consumers were loyal to domestic brands, Nissan agreed to eliminate Cadillac, Lincoln and Oldsmobile from the total number of competitive brands registered in Lavery's Primary Market Area. *Id.* at 9 (Finding of Fact 44). And because domestic manufacturers offer several imported luxury brands, Nissan also agreed to reduce the number of Jaguars (Ford). Volvos (Ford) and Saabs (General Motors) in its calculations. *Id.* at 9–10 (Findings of Fact 45–47). These accommodations resulted in what the parties refer to as an "Adjusted Import Luxury" standard.

Lavery nonetheless continued to underperform. Sales continued to lag, and it failed to achieve its goal of attaining a Consumer Satisfaction Index score at the regional average. Nissan responded by extending the Dealer Improvement Program for two six-month periods.

On September 15, 1998. Nissan issued a notice of default to Lavery because it had "failed to improve its overall sales performance to reach and consistently maintain regional average performance on a long term basis . . . [and] Lavery's [Consumer Service Index] performance failed to improve while on the [Dealer Improve-

ment Program]." JA 372. In order to avoid termination. the notice of default required Lavery to meet regional averages in sales and Consumer Service Index performance within the next six months. Nissan later extended this cure period by 90 days. By the end of 1998, Lavery ranked last in sales performance out of 49 dealers in Nissan's Central Region. D. Ct. Op. at 13 (Finding of Fact 73).

On October 26, 1999, Nissan issued a notice of termination to the dealership. In response. Lavery filed this lawsuit in federal district court on December 20, 1999. Nissan agreed to delay the termination pending the outcome of this litigation.

## II.

In their complaint, Lavery, Greentree Investment Co. and Fred Lavery (collectively "Lavery") brought one federal-law claim and numerous pendent state-law claims. In an order that Lavery does not appeal, the district court dismissed several of the claims, leaving for trial claims premised on the following theories of relief: (1) violation of the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221 *et seq.;* (2) violation of the Michigan Dealer Act. Mich. Comp. Laws §§ 445.1561 *et seq.;* (3) breach of contract; and (4) breach of the implied duty of good faith and fair dealing.

After a six-day bench trial, the district court issued a 28–page opinion that ruled for Nissan on each of these claims. Among other findings of fact and conclusions of law, the court concluded that Nissan acted reasonably and in good faith in its dealings with Lavery and that the dealership failed to meet the reasonable performance objectives provided for in the dealership agreement.

## III.

On appeal, Lavery argues that the district court (1) misconstrued the Michigan Dealer Act. (2) failed to rule as a matter of law that Nissan acted in bad faith under the Michigan Dealer Act, (3) improperly struck its claim for damages and its jury demand and (4) failed to find that Nissan breached the dealership agreement.

## A.

Lavery initially argues that Nissan failed to satisfy two requirements of the Michigan Dealer Act: (1) it did not terminate Lavery within two years of learning about its sales and service problems; and (2) it failed to give Lavery proper notice of these problems.

The Michigan Dealer Act. Mich. Comp. Laws §§ 445.1561 *et seq.,* regulates the relationship between automobile manufacturers and automobile dealers. Among many other regulations, the Act places limitations on a manufacturer's authority to terminate a dealership agreement. Under Mich. Comp. Laws §§ 445.1567(1), a manufacturer may not

cancel, terminate, fail to renew, or refuse to continue any dealer agreement with a new motor vehicle dealer unless the manufacturer or distributor has complied with all of the following:

(a) Satisfied the notice requirements of [Mich. Comp. Laws § 445.1570].

(b) Acted in good faith.

(c) Has good cause for the cancellation, termination, nonrenewal, or discontinuance.

The section provides two definitions of "good cause." First, Mich. Comp. Laws § 445.1567(2) provides:

Notwithstanding any agreement, good cause shall exist for the purposes of a termination, cancellation, nonrenewal, or discontinuance under subsection (1)(c) when both of the following occur: (a) there is a failure by the new motor

vehicle dealer to comply with a provision of the dealer agreement and the provision is both reasonable and of material significance to the relationship between the manufacturer or distributor and the new motor vehicle dealer and (b) the manufacturer or distributor first acquired actual or constructive knowledge of the failure not more than 2 years prior to the date on which notification was given pursuant to [Mich. Comp. Laws § 445.1570].

Second, Mich. Comp. Laws § 445.1567(3) reads:

If the failure by the new motor vehicle dealer to comply with a provision of the dealer agreement relates to the performance of the new motor vehicle dealer in sales or service, good cause shall exist for the purposes of a termination, cancellation, nonrenewal, or discontinuance under subsection (1) when the new motor vehicle dealer fails to effectively carry out the performance provisions of the dealer agreement if all of the following have occurred:

(a) The new motor vehicle dealer was given written notice by the manufacturer or distributor of the failure.

(b) The notification stated that the notice of failure of performance was provided pursuant to this act.

(c) The new motor vehicle dealer was afforded a reasonable opportunity to exert good faith efforts to carry out the dealer agreement.

(d) The failure continued for more than 180 days after the date notification was given pursuant to subdivision (a).

As a general rule, then, § 445.1567(1) required Nissan to do three things before it terminated Lavery's dealership: (1) give notice in compliance with Mich. Comp. Laws § 445.1570; (2) act in good faith; and (3) establish "good cause for the cancellation, termination, nonrenewal, or discontinuance" of the dealer agreement. Subsection (1) does not define "good cause" for the termination; that is the job of subsections (2) and (3).

Subsection (2) provides a "good cause" rule for general breaches of the dealership agreement. And subsection (3) provides a "good cause" rule for failures to comply with performance requirements of a dealership agreement. Both parties agree that the termination in this case stemmed from a deficiency in sales performance.

■ Against this statutory backdrop. Lavery argues that the knowledge requirement under subsection (2)—that the manufacturer first acquire knowledge of the failure less than two years before terminating the dealer—applies to all terminations for "good cause" and that Nissan failed to satisfy the requirement. There are two answers to this argument. One, that is not what the statute says. Nothing in subsection (3) says that the dealer must not only satisfy the requirements of this subsection but must also satisfy the requirements of subsection (2). To the contrary, subsection (3) says that "[i]f the failure ... relates to the performance of the ... dealer in sales or service, good cause shall exist for the purposes of a termination" if four requirements are met. Conspicuously missing from those four requirements is a two-year-knowledge provision. And subsection (1) nowhere says that an automobile manufacturer who believes a dealer has not lived up to its performance obligations under the agreement must satisfy the "good cause" requirements of subsections (2) *and* (3).

Two, an interpretation of the statute that conjoins these requirements makes little sense. The common link among the four termination requirements under subsection (3) is that the dealer must have

notice and a reasonable amount of time to cure the performance problems. One cannot add a fifth requirement compelling a manufacturer to terminate the dealer within two years of first learning about performance problems without slighting these other requirements–particularly the "reasonable opportunity" to cure requirement. Were this the correct interpretation of the statute, in other words, Nissan would have been forced to terminate Lavery in 1997 rather than giving the dealer one opportunity after another to improve its performance until 1999. While Lavery may find this interpretation helpful at this point, it is difficult to imagine this dealer (or any other dealer) agreeing to such a requirement in a dealership agreement, and it is even harder to imagine a Michigan legislator who would knowingly impose it on dealerships across the State, particularly in the context of a statute designed to limit the authority of manufacturers to terminate dealerships precipitously.

Attempting to counter this conclusion. Lavery points out that good cause under subsection (2) requires the breach of a dealer agreement provision that "is both reasonable and of material significance" while subsection (3) has no such requirement. Reading the two provisions separately. Lavery concludes, leads to a situation in which manufacturers (like Nissan) could terminate dealers for *any* deficiency in sales or service, no matter how modest or how immaterial. But this slope is not as slippery as Lavery contends. Subsection (3) does not say that the manufacturer may terminate a dealer for *any* sales or service deficiency; it must be a deficiency *in the agreement* and accordingly it must be a deficiency that the dealer agreed was a legitimate ground for termination. And subsection (1)(b), which governs all terminations, requires the manufacturer to "[a]ct[ ] in good faith," which means "honesty in fact and the observation of reason-

able commercial standards of fair dealing in the trade." Mich. Comp. Laws § 445.1564(1). This overriding requirement protects dealers from arbitrary and capricious manufacturers when the dealership for one reason or another cannot protect itself.

Lavery next argues that the district court erred in excusing Nissan from failing to cite the Act in its notice of default, as required by Mich. Comp. Laws § 445.1567(3)(b). Numerous Michigan cases, however, confirm that the failure to comply with each and every aspect of a statutory-notice provision does not necessarily render the notice invalid. When the party entitled to notice already has actual notice of the relevant facts. Michigan courts have been willing to excuse the failure to comply with a notice provision in its entirety. *See In re TM,* 245 Mich.App. 181, 628 N.W.2d 570, 574–75 (2001) (party failed to send notice by registered mail, return receipt requested, but nonetheless "substantially complied with the [ ] notice requirements by sending notice .... and it was established at the hearing ... that notice was received"); *Nicholas v. Meridian Charter Township Bd.,* 239 Mich.App. 525, 609 N.W.2d 574, 578 (2000) (failure to abide by notice provision of Open Meetings Act did not invalidate board's decisions when "[n]othing that took place was secreted or otherwise unknown .... [and][t]hus, the purpose of the [act] was essentially and realistically fulfilled"); *Arnold Transit Co. v. City of Mackinac Island,* 99 Mich.App. 266, 297 N.W.2d 904, 908 (1980) ("The rationale of the substantial compliance rule is that while notice provisions in statutes are mandatory. they are essentially procedural; that rigid adherence to such a procedural mandate will not be required if it is clear that a substantial compliance provides realistic fulfillment of the purpose for which the

mandate was incorporated in the statute.") (quotation and citation omitted); *Dozier v. State Farm Mut. Auto. Ins. Co.*, 95 Mich. App. 121, 290 N.W.2d 408, 411–12 (1980) ("[S]ubstantial compliance with the written notice provision which does in fact apprise the insurer of the need to investigate ... is sufficient compliance.").

■ Nissan comes well within the requirements of these cases. Fred Lavery, the president of Lavery Infiniti, had actual notice that the Act governed this termination. Less than one month after receiving the notice-of-default, the district court found. Fred Lavery drafted (but never sent) two letters to Nissan indicating the notice of default was "in violation of Section 7(1) [codified at Mich. Comp. Laws § 445.1567(1)] of the Michigan Motor Vehicle Dealer Franchise Act." JA 628, 633. Not only was Fred Lavery thus fully aware of the Act and its requirements, but he also was capable of citing the specific statutory provision applicable to his case. Nissan, in short, substantially complied with the Act's notice requirements.

Nor may Lavery tenably rebut this conclusion on the ground that the "plain language" of the Act prohibits this conclusion because the Act does not provide a "substantial compliance" safe harbor for manufacturers like Nissan. True enough. But neither does the Act say that the failure to comply with a notice provision renders the entire notice invalid, no matter the circumstances of noncompliance and no matter the dealer's actual knowledge of the information at issue. In interpretive settings like this one, Michigan courts (like most courts) presume that the legislature meant to fill statutory gaps with applicable interpretive rules that the courts have long employed. *See Gordon Sel–Way, Inc. v. Spence Bros., Inc.*, 438 Mich. 488, 475 N.W.2d 704, 714 (1991) ("It is a well-established principle of statutory construction that the Legislature is presumed to act with knowledge of statutory interpretations by the Court of Appeals and this Court."). The substantial-compliance doctrine is one such doctrine, and the district court's reliance on it here was anything but disrespectful of the plain language of the statute.

### B.

■ Lavery separately argues that it should have prevailed on the issue of "good faith" as a matter of law. *See* Mich. Comp. Laws § 445.1567(1)(b). According to Lavery, Nissan inherently acted in bad faith by requiring it to achieve the regional average in sales penetration and consumer satisfaction. But as Lavery admits, this issue is ordinarily "a matter for factual weighing" for the district court in a bench trial. Appellant Br. at 40. In this instance, ample evidence supported the district court's finding of good faith: Nissan assisted Lavery through its six-month Dealer Improvement Program. D. Ct. Op. 7–8 (Findings of Fact 32–37); it extended the term of the Dealer Improvement Program twice, *id.* at 11 (Finding of Fact 58); and it measured sales performance (at Lavery's urging) using the favorable Adjusted Import Luxury standard, *id.* at 9–11 (Findings of Fact 41–53). Relying on this evidence, the district court concluded that Nissan acted in "good faith" because it "observed reasonable commercial standards of fair dealing," and Lavery presented "no evidence that [Nissan] acted dishonestly." *Id.* at 21 (Conclusion of Law 3). The district court did not err in reaching this conclusion.

### C.

Lavery next challenges the district court's order striking (1) its claim for compensatory damages, (2) its claim for puni-

tive damages and (3) its jury demand. Each claim is unavailing.

■ The district court held that because Nissan agreed not to terminate the dealer agreement while the case was pending, Lavery did not suffer any compensatory damages and could seek only prospective relief in the form of an injunction preventing termination. Although Lavery persists that it suffered cognizable damages, it fails credibly to explain how. A party seeking relief must prove damages, just as it must prove every other element of a legal claim. *See Rodgers v. Fisher Body Div., Gen. Motors Corp.*, 739 F.2d 1102, 1107 (6th Cir.1984) ("[D]amages must be proved; they must not be speculative."). Lavery, however, offers no evidence of damages and concedes that its theory of damages—lost profits and damages to its reputation—are "incalculable with any degree of accuracy." Appellant Br. at 45. On this record, the district court did not err in rejecting this claim.

■ As for punitive damages, Michigan law prohibits the recovery of punitive damages (or exemplary damages, as Michigan labels them) for a statutory claim unless the statute itself authorizes the damages. *See B & B Inv. Group v. Gitler*, 229 Mich. App. 1, 581 N.W.2d 17, 21 (1998) ("[W]here a cause of action is statutorily based, there must be a basis in the statute for awarding exemplary damages, *i.e.*, either an express provision or [ ] legislative history from which one could infer a legislative intent to provide such an unusual remedy.") (citation and quotation omitted). The Michigan statutes upon which Lavery relied in bringing this claim do not provide for exemplary damages. And California law, which (the parties agree) governs the breach of contract claims, permits punitive damages only "[i]n an action for breach of an obligation *not* arising from contract." Cal. Civ.Code § 3294(a) (emphasis added).

Here all of Lavery's claims arose from the dealer agreement.

The Seventh Amendment preserves the right to trial by jury in lawsuits involving legal, not equitable, rights. *See Parsons v. Bedford*, 28 U.S. 433, 446–47, 3 Pet. 433, 7 L.Ed. 732 (1830). Because Lavery's claims seek only equitable relief, the Seventh Amendment does not give the company a right to a jury trial. *See Golden v. Kelsey–Hayes Co.*, 73 F.3d 648, 659 (6th Cir.1996).

### D.

Lavery lastly contests several of the district court's findings of fact and conclusions of law related to the breach-of-contract claim. We review the district court's findings of fact for clear error. *see Berger v. Medina City School Dist.*, 348 F.3d 513, 519 (6th Cir.2003), its conclusions of law de novo, *id.*, and any mixed questions of law and fact de novo, *see Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 541 (6th Cir.2001).

Lavery claims that the district court erred when it concluded that achieving the regional average in sales penetration was a "reasonable sales objective" under the agreement. *See* D. Ct. Op. at 26 (Conclusion of Law 30). As Lavery sees it, requiring average performance is inherently unreasonable because it means that a large number of dealers will be in breach of their dealer agreements at any given time. Whether one acts "reasonably" is generally a mixed question of law and fact. *See Century Prods., Inc. v. Sutter*, 837 F.2d 247, 253 (6th Cir.1988) ("The question of whether an individual's conduct was reasonable under the circumstances is a mixed question of law and fact.").

■ Lavery, however, is in no position to challenge Nissan's actions on this

ground. The dealership was not terminated for being average or even for being below average but for being conspicuously below the performance of other dealerships. The district court's findings of fact—most of them left unchallenged by plaintiffs—show that Nissan had ample reasons to terminate Lavery, reasons that had nothing to do with the failure to be average. In 1999, when Nissan issued its notice of default, Lavery ranked last in sales penetration out of 52 Infiniti dealers in the Central Region, and next to last of 148 dealers in the country. D. Ct. Op. at 13 (Findings of Fact 74–75). For years 1996–1998, Lavery achieved only 54%, 80% and 64% of the regional averages in sales. JA 227; *see also* D. Ct. Op. at 11 (Finding of Fact 55) (even after participating in the dealer improvement program, Lavery achieved its sales objectives in only two of the fifteen months between July 1997 and September 1998); *id.* at 12 (Findings of Fact 63–64) (Lavery's year-to-date sales in September 1997 were 60% of the regional average, while its nearest competitor, Suburban Infiniti, achieved 161% of the regional average).

Lavery next takes issue with the district court's decision that the Adjusted Import Luxury standard was a "reasonable sales objective" under the dealer agreement. D. Ct. Op. at 26 (Conclusion of Law 31). Like the district court's other conclusions concerning "reasonableness," this is a mixed question of law and fact. Lavery claims that it continuously complained about the standard, which failed to account for all of the unique characteristics of the Detroit auto market. But the district court's factual findings—which again Lavery does not dispute—show that Fred Lavery requested that Nissan change its standard sales penetration formula to accommodate him. *Id.* at 9 (Finding of Fact 41). When Nissan complied, Fred Lavery called the measure a showing of good faith. *Id.* at 10

(Finding of Fact 50). He also agreed that the standard was "a fair and reasonable step" and "more equitable" than previous measures. *Id.* (Finding of Fact 51). Under these circumstances, Lavery is in no position to challenge the district court's conclusion that the standard was a "reasonable sales objective" under the agreement.

Lavery next complains that its Consumer Service Index scores were in fact close to average for the region, and the district court erred in holding that it scored below average. *See* D. Ct. Op. at 22 (Conclusion of Law 7). Nissan's notice of termination indicates that Lavery never met the average in the three years prior to termination. *See* JA 228 (for years 1996–1998, Lavery achieved 93%, 91% and 98% of the Consumer Service Index regional average respectively). Lavery has not shown that these conclusions are wrong. The problem here of course is not just failing to be average in a given year; it is failing not to reach that mark in three straight years. At any rate, the record shows that poor sales performance was Nissan's primary reason for terminating the dealership, and that decision was amply supported. *See id.* at 229 ("Infiniti hereby gives notice of its intent to terminate [Lavery] . . . because of [Lavery's] failure to achieve satisfactory sales penetration performance.").

Lavery next argues that the district court improperly found that Lavery's "large" Primary Market Area—which Nissan used to establish Lavery's sales penetration percentage—was reasonable. In reaching this conclusion, the district court credited the testimony of Nissan's expert, who opined that a smaller Primary Market Area would not have materially increased Lavery's performance. *See* D. Ct. Op. at 18 (Findings of Fact 108–10). Instead of arguing that this finding is clearly erroneous, Lavery points only to the contrary

testimony of its expert. Lavery has not shown that the district court committed clear error in making this finding. *See Anderson v. City of Bessemer,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

Lavery next complains that the district court clearly erred in finding that the sales performance of Suburban Infiniti, the only other Detroit-area Infiniti dealer, provided a fair comparison to the sales performance of Lavery. *See* D. Ct. Op. at 15 (Finding of Fact 90). Nissan used Suburban Infiniti to show that its expectations for Lavery were reasonable because Suburban Infiniti routinely exceeded the goals Nissan set for Lavery. *See id.* (Findings of Fact 89–90). Despite Fred Lavery's admission that Suburban Infiniti faced the same challenges as he did in the Detroit market, Lavery argues that the district court's finding is unsupported by the record. Instead of explaining why this finding is unsupported. Lavery again points to the conflicting testimony of plaintiffs' expert. And, again, that does not suffice.

Lavery lastly argues that the district court ignored the testimony of its expert. Dr. Manuel. The problem from Lavery's perspective, however, is not that the district court ignored this testimony; it is that it did not credit many of the conclusions Dr. Manuel reached—most particularly, that Nissan's standards were not "reasonable sales objectives" under the dealer agreement. Not all of Dr. Manuel's testimony, as an initial matter, supported some of the district court's conclusions. He admitted that he had never known of a manufacturer (outside the context of litigation) to make greater concessions at a dealer's request than Nissan did in calculating Lavery's sales performance. In the face of this admission and in the face of the testimony of Nissan's experts, the district court did not commit clear error in generally crediting the expert testimony of Nissan's expert. *See Anderson,* 470 U.S. at 573. Nor did it commit reversible error in failing to make findings about the credibility of each expert. *See United States v. Strahan,* 984 F.2d 155, 157 (6th Cir.1993) (while "it would be helpful if judges explained their credibility determinations," the failure to do so does not require a remand) (quotation omitted).

IV.

For the foregoing reasons, we affirm the district court's judgment.